PORTER VS UNITED STATES.

Opinion delivered Sept. 26, 1907.

(104 S. W. Rep. 855).

1. *Criminal Law—Testimony of Wife of Accused.*

The error made when the wife of the accused was allowed to testify against him may be reversed.

2. *Competency of Witnesses.*

One unacquainted with the marriage laws of the Indians of the Chickasaw Nation is not competent to testify in regard to that law.

3. *Laws—Best Evidence.*

The authenticated laws passed by the Chickasaw Nation forms the best evidence in regard to those laws.

4. *Judicial Notice of Laws.*

Judicial notice will be taken by the court that the common law of marriage is in force among the Indians.

5. *Marriage by Common Law.*

A common law marriage is valid, where the persons of marriageable age and no disability, make an agreement to live together as man and wife and consummate the agreement by so living.

6. *Criminal Law—Wife of Accused.*

In a criminal case where the witness testified that, although no agreement had been made, she and the accused had been living together as man and wife witness was incompetent to testify being the wife of the accused.

7. *Same—Opinion of Court.*

In a homicide case where the court is in doubt as to whether witness

is wife of accused and therefore incompetent to testify against him, accused should be given the benefit of the doubt and witness not permitted to testify.

Appeal from the United States Court for the Southern District of the Indian Territory; before Justice J. T. Dickerson, September 22, 1904.

Harrison Porter was convicted of murder, and he appeals. Reversed and remanded.

*Cruce, Cruce & Bleakmore* and *Crawford & McKeown*, for appellant.

*George R. Walker*, U. S. Atty., and *James E. Humphrey*, Asst. U. S. Atty.

LAWRENCE, J. Appellant was indicted for a murder alleged to have been committed in the Southern district of the Indian Territory September 25, 1902. He was tried, found guilty without capital punishment, and on September 22, 1904, was sentenced to serve in the United States penitentiary at Ft. Leavenworth, Kan., for the term of his natural life. From that judgment he prosecutes his appeal, and as ground therefor assigns four manifest errors alleged to have been committed by the court below. Upon argument, his attorneys withdraw all errors but two, being the second and fourth. The second error charged is the court permitting the government to call, and use in its behalf, as rebutting testimony, that of a witness named Alice Harjo, over the objection of appellant after her examination as to her competency; the ground of objection being that the testimony was improper because not rebuttal, and further because the voir dire examination disclosed that she was the wife of appellant, and was at the time of the occurrences sought to be proved by her. The court overruled the objection and permitted her examination on behalf of the United States. The only other ground of error was that there was not sufficient proof of venue to justify a judgment on the verdict.

It is plain that, if this witness was incompetent to testify because she was the wife of appellant, the error would be sufficient to demand a reversal of the judgment, without consideration of the other point made in this second assignment of error, which is more technical than meritorious. In order that this principal point may be fully understood, the testimony of this witness, and one other, who was called by the government to prove the Choctaw law of marriage at the date of the supposed marriage of witness and appellant, which she states was three months prior to the alleged murder, which was September 25, 1902, is here set forth in full, as it appears in the record, as follows:

"Alice Harjo, called and sworn on behalf of the government on rebuttal, testified as follows: Direct Examination by Mr. James E. Humphrey; Mr. John Davis called as Interpreter: 'Q. What is your name? A. Alice Harjo. Q. What relation are you and Aunt Lucy Harjo? A. She is my mother. Q. Do you know Harrison Porter, the defendant? A. Yes, sir. Q. Did you and Harrison Porter marry? A. No, sir. Q. State whether or not you lived together? A. Yes, sir; we lived together. Q. How long? A. About three months. Q. Was that about the time of this killing? A. Yes, sir.' By Mr. Cruce: 'I would like to ask the witness a few questions as to her competency.' By the Court: 'You may do so. Questions by Mr. A. C. Cruce: 'Q. Was you and Harrison Porter living together as husband and wife? A. Yes, sir; we was living as man and wife. Q. Did you and Harrison, at the time you began to live together as husband and wife, agree that you were husband and wife, and that you would live together as husband and wife? A. It wasn't agreed. Q. How did you and Harrison Porter happen to commence to live together as husband and wife?' (To which counsel for the government objects). By the Court: 'I think that examination has gone far enough.' By Mr. A. C. Cruce: "We object to this

woman testifying, because, as I understand it in this jurisdiction, there can be either statutory or common-law marriages. If the relation of husband and wife existed at that time, she is not a competent witness, even though it was a common-law marriage.' By the Court: 'If you desire, you may inquire further, if you think that light has not been thrown upon it.' 'Q. Did you and Harrison Porter regard each other as husband and wife at the time you were living together?' By the Court: 'I think that question is very leading.' Mr. Cruce: 'I think you may change the form of it.' 'Q. Who, if any one, was regarded as your husband at the time of this killing? A. Harrison Porter; I regarded him as my man.' By the Court: 'You may inquire of this witness her knowledge of the marriage ceremony. What constitutes the marriage relation. 'Q. What does a woman have to do, as you understand it, under the Indian law, to make a man her husband? A. I think they would have to be married? Q. How would they have to be married? A. I don't know.' By the Court: 'Do you understand what the word "marriage" means? What it is to get married? What form would you go through, if you know, in order to become husband and wife? A. I don't know.' By the Court: 'In order to be married, don't you know you would have to have a preacher or officer marry you? A. I don't know.' By the Court: 'Well, after you were married, after you lived together as husband and wife, how could you get separated? How could you quit being husband and wife, in your opinion? A. Why, we just quit.' By Mr. Cruce: 'I would like to have Mr. Davis sworn and ask him a few questions as to the Indian custom of marriage before this witness testifies.'

"Mr. John Davis, called and sworn, testified as follows: Direct Examination by Mr. A. C. Cruce: 'Q. Are you an Indian? A. Yes, sir. Q. Can you state to the court whether or not it is the custom among the Chickasaws, among the full-

bloods, for a man and woman to become husband and wife by living together and without any marriage ceremony? A. I think they did quite a while back. But the Chickasaws passed a law making all of those that have been living that way man and wife. Here the last few years they had to be married.' By the Court: 'How many years? A. Ever since 1898.' By the Court: 'I think, gentlemen, I will admit this testimony..

"Alice Harjo recalled. Direct Examination by Mr. James E. Humphrey: 'Q. Did you see this shooting? A. Yes, sir. Q. Did you see Dillard Wright when he got shot? A. I saw it.' (Counsel for the defendant objects to this testimony because it is testimony in chief, and the government has rested its case). By Mr. Humphrey: 'It is probably in rebuttal of the defendant's testimony, but perhaps really it should have been introduced as original testimony. I ask the indulgence of the court. It is on the question as to who did the shooting. It is on an important matter, and I ask the indulgence of the court.' By the Court: 'I very much regret that this witness wasn't put on in the first place. I think it would be too bad for an important witness like this to go unheard. I will permit the testimony.', (To which ruling of the court the defendant excepts). Q. Who shot Dillard Wright? A. Harrison Porter.' Cross-Examination by Mr. A. C. Cruce: 'Q. Where were you? A. At my mother's house. Q. Was you inside the house? A. I was on the outside. Q. Where was Keno Harjo? A. He was standing right close to us.' "

We think it clear from this testimony that Alice Harjo and this appellant, since June, 1902, have been husband and wife. The testimony of the witness Davis was incompetent, as it was not shown that he was learned in the law of the Chickasaw Nation as to marriages of Indians in that nation, and his statement as to what laws were passed by the Chickasaws was incompetent as not the best evidence. The laws duly

authenticated would be the best evidence. Assuming that the court could not take judicial knowledge of the Chickasaw laws, they were subject to the same rule of proof as are al foreign laws, by duly authenticated copies, or books containing the laws purporting to be published by public authority, or by some one who testifies that he is learned in the laws of such foreign country. All states and territories of the Union are in this sense foreign to each other. The court does take judicial notice that the common law of marriage is in force in this jurisdiction, and under that law the formality of license to marry, issued by legal authority, and the performance of a ceremony of marriage by person designated by the statute, is not requisite to constitute a lawful marriage. The marriage is valid if the parties be of marriageable ages and under no legal disability agree to live together as man and wife, and consummate this agreement by living together as husband and wife. When asked if she and defendant were married, she said: "No, sir." When asked by attorney for appellant if she and he were living together as husband and wife, she answered: "Yes, sir; we was living as husband and wife." When further questioned, she was asked if she "and Harrison (meaning appellant), when you began to live together as husband and wife, agreed that you were husband and wife, and that you would live together as husband and wife." She answered: "It wasn't agreed." Manifestly this ignorant Indian woman had in her mind a formal agreement. The law does not require the agreement to be couched in the formal language of the learned or of business people. If the court can be satisfied that the persons assumed all the relations of married people, with the honest purpose of living together as man and wife, the relation would thereby become as firmly fixed as though the most rigid formality of marriage had been observed by the parties. The full examination which appears above ought to be enough to satisfy the court upon a collateral issue of this character that the pre-

sumption of marriage, with the testimony of the witness, rendered her incompetent to testify against appellant. The testimony of herself, and as well that of Davis, was manifestly erroneous, and highly prejudicial to appellant. We think the court, upon a question of this kind, it being addressed to the court entirely, to determine as a mixed question of law and fact, should be governed by its decision under the rule of reasonable doubt—that is, the fact of marriage—and therefore the competency of the evidence should appear beyond all reasonable doubt.

We believe the following extract from the printed argument of counsel for the government is applicable: "In case of Casat vs State, 40 Ark. 517, where a witness swore he was present at the killing of Barnes, and that as Casat walked past him, after the deed was done, he remarked: 'There was one more man to die yet.' The objection to the testimony of this witness was it was allowed in rebuttal, where it should have been offered in chief. The Supreme Court said: 'In the order of the production of evidence, the courts are invested with a large discretion. We shall not find fault with them in this respect, so long as they admit none but legal evidence and exclude only that which is incompetent.' " It is to be noted that the government had but one eyewitness to the shooting who positively swore that the appellant shot deceased, and this witness was leaving the scene of the tragedy, bent over upon his horse going as fast as it could go, while the defense produced the testimony of two credible witnesses who were standing and looking on, and who as positively swore that appellant did not fire the shots that killed Dillard Wright. Why Alice Harjo was not offered in chief is not explained. If she was competent, her testimony was of the utmost importance to the government, for without it the jury could have, and probably would have, acquitted appellant of the crime of murder. It therefore behooves the court to carefully consider

the rights of the accused in passing on this question. No argument of convenience or supposed miscarriage of justice should in the least affect the conclusion to be reached. If there should be in the mind of the court any reasonable doubt as to the competency of this evidence, it should be resolved in favor of the one whose life, or liberty during life, is in the balance.

The remaining error, that the venue of the crime was not proven, disappears, when an examination sufficiently shows proof of venue.

The judgment is reversed, and cause remanded for retrial.

GILL, C. J., and CLAYTON and TOWNSEND, JJ., concur.